UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-cv-272-RJC-DSC

DAVID BARNETT, )
)
      Plaintiff, )
)
v. )
) ORDER
BANK OF AMERICA, N.A., )
)
      Defendant. )
)

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment, (Doc. No. 27), Plaintiff's Amended Response in Opposition, (Docs. Nos. 34, 36), and Defendant's Reply. (Doc. No. 37). The motion is now ripe for adjudication.

I.    BACKGROUND

A.

Plaintiff David Barnett ("Barnett") filed this action against Defendant Bank of America, N.A. (BOA) after BOA called Barnett's cell phone several hundred times over a short period of time in an effort to collect a debt.

In the light most favorable to the non-moving party, Barnett had applied for and received a BOA credit card on July 15, 2013. (Doc. No. 27-3 at 4–5). Barnett provided BOA his cell phone number in this application. (Id.; Doc. No. 27-4 at 6). Later, Barnett orally granted BOA permission to call his call phone with auto-dialers and pre-recorded messages during a January 20, 2015 phone call with a BOA representative. (Doc. No. 27-3 at 23).

Barnett eventually fell behind on payments due on his account. (Doc. No. 27-4 at 6–7). On May 8, 2019, Barnett received a call from BOA regarding the debt. (Doc. No. 27-3 at 25–26). Barnett explained that he did not currently have the money and that he had recent knee surgery, but said "I'll call you as soon as I can pay you." (Doc. No. 27-3 at 25). The BOA representative stated that "the calls are continuing because we haven't come to a resolution" and asked whether anyone has discussed an assistance program with him, to which Plaintiff replied "[n]o Ma'am. But I just call you. I can't do nothing right now anyway. Okay? . . . But when I can, I'll give you a call, okay?" (Id.). The BOA representative replied: "Okay well the calls are going to continue and we can give you some assistance," to which Barnett responded, "Okay. Just keep. Okay. That's fine. All right. Thank you." (Doc. No. 27-3 at 26).

On May 18, 2019, Barnett received another call from BOA. In that call, Barnett told BOA to "put it in the mail for me. Send it to me. When I get it, I'll see what I can do." (Doc. No. 27-3 at 28). At the end of the call he reiterated, "[l]ike I said. Send it to me in the mail." (Id.). The call did not explicitly discuss contact by phone. (Id.). On May 25, 2019, BOA called again regarding the same issue. During the call Barnett said that he did not currently have the money, that he had recently undergone knee surgery, and "just send it to me in the mail . . . ." (Doc. No. 27-3 at 30). The call did not explicitly discuss his being contacted by phone.

BOA proceeded to call Barnett over 300 times from April 2019 to September 2019. (Doc. No. 27-3 at 8–18). Barnett has testified that these calls gave him

stress, aggravation, headaches, upset stomachs, and worsened his pre-existing thyroid problem requiring additional medication.  (Doc. No. 34-3).

The record evidence shows that these telephone calls were placed with BOA's Avaya Proactive Contact ("Avaya") system.  (Doc. No. 27-3 at 2; Doc. No. 27-4 at 16–17).  Avaya calls telephone numbers from a list of BOA customers, such that when a BOA agent uses the system, Avaya delivers telephone numbers in a call list to the agent, and when the agent logs in the Avaya system begins calling customers who have defaulted on their accounts.  (Doc. No. 27-4 at 17).

There is no evidence that the Avaya system generates random or sequential numbers, or that it is capable of doing so.  (Doc. No. 27-5 at 3).  BOA states that changes to the system to allow Avaya to generate random numbers would not be permitted and would be extremely difficult if not impossible.  (Id.).  The Avaya system selects accounts based on a number of factors, including balance, delinquency stage, recency of payment, recency of contacts, and others.  (Doc. No. 34-13 at 23–24).  A BOA employee also testified that the calling agent will "select the ability to get an account up, and then the Avaya dialer will launch one of the calls, a call on one of the phone numbers that is attached to that account, and then the agent will work the account."  (Id. at 16).  BOA has two different campaigns of phone calls: manual, and auto-dialer.  (Id. at 25).  When the system detects that the recipient of the call has not picked up, Avaya has the capability to leave a pre-recorded message.  (Id. at 31).  Plaintiff objects to Defendant's description of the calling system. However he does not produce contrary evidence,, but states only that Defendant has not sufficiently complied with discovery orders requiring

3

Defendant to produce information regarding its calling system. (Doc. No. 34 at 10–13).

B.

Plaintiff filed a Complaint in this Court against Defendant on May 12, 2020. (Doc. No. 1). Defendant filed its answer on June 18, 2020, and an Amended Answer on July 14, 2020. (Docs. Nos. 7, 8). The parties filed for a Protective Order on October 7, 2020 that the Court granted on October 9, 2020. (Docs. Nos. 11, 12).

On January 19, 2021, Plaintiff filed a Motion to Compel, seeking to require Defendant to respond to discovery requests regarding Defendant's telephone systems, policies, and procedures. (Doc. No. 18). The Court granted this motion in part and denied it in part; the motion was granted as to requests for production numbers 2, 20, and 23, and denied as moot as to requests 11, 18, and 19, as Defendant had since responded to these requests. Plaintiff did not appeal the order or file any additional motions to compel prior to the end of the discovery period.

On February 26, 2021, after Discovery had ended, Defendant filed a Motion for Summary Judgment. (Doc. No. 27). Plaintiff filed a Response on April 2, 2021, followed by an Amended Response on April 15, 2021. (Docs. Nos. 31, 34). Defendant filed a Reply on April 30, 2021. The motion is now ripe for review.

## II. MOTIONS FOR SUMMARY JUDGMENT

Defendant moves for summary judgment on all claims.

### A. Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quotation marks omitted). This "burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once this initial burden is met, the burden shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. The nonmoving party may not rely upon mere allegations or denials of allegations in the pleadings to defeat a motion for summary judgment; rather, it must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Id. at 248; accord Sylvia Dev. Corp. v. Calvert Cty., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences therefrom in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The mere argued existence of a

factual dispute does not defeat an otherwise properly supported motion. <u>Anderson</u>, 477 U.S. at 248–49. "If the evidence is merely colorable or is not significantly probative," summary judgment is appropriate. <u>Id.</u> at 249–50 (citations omitted).

### B. Plaintiff's TCPA Claim

Plaintiff has filed a claim for relief under the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. This Act prohibits companies from engaging in certain specific types of communications with consumers. In the section relevant to this matter, the Act states that:

> It shall be unlawful for any person within the United States . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice — to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States.

47 U.S.C. § 227(b)(1)(A).

Defendant argues that Plaintiff's claim under this Act fails on two independent grounds: first, that Defendant's dialing technology does not qualify as an automatic telephone dialing system as defined by the TCPA, and second, that Plaintiff consented to receive Defendant's calls in question. The Court will address each argument in turn.

### 1. <u>Whether Defendant's Avaya Technology Is an Automatic Telephone Dialing System (ATDS)</u>

The TCPA defines "automatic telephone dialing system" (ATDS) as equipment with the capacity to: "(A) store or produce telephone numbers to be called, using a random or sequential number generator; and (B) dial such numbers." 47 U.S.C. §

227(a)(1). Defendant argues that BOA's Avaya system is not an Automatic Telephone Dialing System as a matter of law. (Doc. No. 27-1 at 5).

The Supreme Court held last month that, for equipment to qualify as an ATDS, the TCPA "requires that in all cases, whether storing or producing numbers to be called, the equipment in question must use a random or sequential number generator." Facebook, Inc. v. Duguid, 141 S. Ct. 1163, 1170 (U.S. 2021). Mindful of this ruling, Plaintiff repeatedly states in his amended brief that Defendant's system uses a random or sequential number generator. As evidence, Plaintiff cites deposition testimony from Defendant's employees stating that the numbers are selected for calls based on several factors. However, this very testimony undermines Plaintiff's argument, as the numbers chosen for the calls are selected from a pre-existing list created based on criteria from the dialer administrators, rather than by random or sequential number generators. (Doc. No. 34 at 14–15) (citing Ex. 11 at 22:14–23:9). Plaintiff points to deposition testimony that if a customer does not answer "they may be called back later on that day," but this does not demonstrate that Defendant uses a random or sequential number generator, nor does the system's capability to allow the dialer to leave a message. (citing id. at 19:25–30:8; 35:7–14). Defendant is entitled to summary judgment based on the Supreme Court's ruling in Facebook, along with the lack of Plaintiff's evidence that the Avaya system uses a random or sequential number generator, and Defendant's affirmative evidence that the system does not use such a number generator. (See, e.g., Doc. No. 27-5 at 3; Doc. No. 27-4 at 17).

Almost in anticipation of this outcome, Plaintiff argues that he is missing

critical information on Defendant's calling system because Defendant has failed to comply with the Magistrate Judge's February 10, 2021 Order compelling discovery in this area.¹ (Doc. No. 34 at 11–13). Plaintiff argues that the information he requested is essential to determine whether Defendant's calling system meets the definition of an ATDS, and asks that the Court make an adverse inference that the withheld material would have shown the system meets the ATDS definition. (Doc. No. 34 at 13). However, Plaintiff's argument is unavailing. Plaintiff had a chance to appeal the Magistrate Judge's discovery ruling on the production of such documents, or to file a new motion to compel based on Defendant's later responses. "[I]t is well established in this district that 'a party must generally move to compel a party to comply with a discovery request prior to the close of discovery or the motion is untimely.'" Wiener v. AXA Equitable Life Ins. Co., 481 F. Supp. 3d 551, 561 (W.D.N.C. 2020) (quoting Willis v. Cleveland Cty., No. 1:18-cv-292, 2020 WL 398508, at *3, 2020 U.S. Dist. LEXIS 11167, at *6–7 (W.D.N.C. Jan. 23, 2020) (denying motion to compel filed after the discovery deadline as untimely), aff'd, 2020 WL 1061680, 2020 U.S. Dist. LEXIS 37912 (W.D.N.C. Mar. 4, 2020)). What Plaintiff cannot do is wait until discovery deadlines have passed and then seek an adverse inference instruction on this issue at summary judgment.

---

¹ Specifically, Plaintiff contends that Defendant has only responded with boilerplate objections and refused to produce documents related to requests for information on Defendant's phone system. Plaintiff states that the answers identified the Avaya system but did not describe its capabilities, nor did the responses describe the UCRS and CRISP systems that Plaintiff also contends Defendant uses. Defendant told Plaintiff that it has been unable to locate further documents that are responsive to Plaintiff's request.

## 2. Whether Plaintiff Legally Consented to the Phone Calls

Even if Defendant's calling system were an ATDS for TCPA purposes, Plaintiff's TCPA claim would fail because Plaintiff legally consented to receive the phone calls.

It is clear that when Barnett provided his cell phone number in his account application he consented to be contacted on it unless he later revoked that consent. Galbreath v. Time Warner Cable, Inc., No. 7:14-CV-61-D, 2015 WL 9450593, at *2 (E.D.N.C. 2015) ("Courts also generally agree[] that providing a cell phone number to a creditor constitute[s] one means of consenting"). After providing his cell number, Plaintiff several times expressly granted consent to be contacted including in 2015. (Doc. No. 27-3 at 23). Plaintiff argues, however, that he revoked his consent by later stating repeatedly that he wanted future communications by mail and explaining that he could not yet pay but would call Defendant when he could do so. (Doc. No. 34 at 18). Plaintiff points to case law stating that "consumers have a right to revoke consent, using any reasonable method including orally or in writing," Cartrette v. Time Warner Cable, Inc., 157 F. Supp. 3d 448, 452 (E.D.N.C. 2016) (internal citations omitted), and to the Restatement (Second) of Torts which states that "consent is terminated when an actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct. This unwillingness may be manifested to the actor by any words or conduct inconsistent with continued consent." Restatement (Second) of Torts § 892A cmt. i. However, Plaintiff's argument fails because his communications were too ambiguous to qualify as a revocation of consent.

Several cases cited by the Defendant, while not on all fours factually with this

case, nonetheless indicate that a clearer statement of revocation is required than exists here. In <u>Goodson v. Designed Receivable Sols</u>, No. CV 15-003308 JVS, 2016 WL 5799321, at *5–6 (C.D. Cal. 2016), the Court found a lack of revocation where the Plaintiff informed the caller that she had already paid the amount being sought, but never asked the caller to "stop calling" or to contact her in a different manner. In <u>Cesaire v. Med. Servs., Inc.</u>, No: 6:15-cv-1886-Orl-28DCI, 2016 WL 6910257, at *5 (M.D. Fla. 2016), the Court found a "conditional" statement not a revocation of consent when the Plaintiff told Defendant that "if you can't give the information [to describe the balance being sought], don't call my phone." The Court determined this statement to be conditional. The Court in <u>Carlin v. Navient Solutions, LLC</u>, 1:19-cv-491, 2020 WL 8254195, at *3 (E.D. Va. 2020) determined that Plaintiff's mere desire for the calls to stop was unavailing if Plaintiff did not actually tell Defendant to stop calling. Finally, the Plaintiff in <u>Hudson v. Sharp Healthcare</u>, No. 13-CV-1807-MMA, 2014 WL 2892290, at *9 (S.D. Cal. 2014), engaged in cooperative dialogue with Defendant regarding payment, never requested not to be called, and did not otherwise object to the information provided on the call including the agent's statement that Plaintiff may receive additional phone calls; as a result, that Court granted summary judgment for the Defendant.

These cases make clear that a Plaintiff cannot use ambiguous statements to revoke consent. Instead, a Plaintiff's words must clearly revoke consent. Here, Plaintiff requested to be contacted by mail, and stated that he would contact Defendant when he was able to pay, but at no point did he directly ask Defendant to stop contacting him. In fact, when Defendant informed Plaintiff that the calls would

10

continue, Plaintiff did not argue and even said "Okay." (Doc. No. 27-3 at 26). Any arguable implication is ambiguous and insufficient for revocation. Plaintiff's TCPA claim therefore fails on the independent grounds that Plaintiff legally consented, and did not explicitly withdraw his consent, to receive the phone calls in question.

## C. Plaintiff's NCDCA Claim

Defendant also seeks summary judgment on Plaintiff's second claim, filed pursuant to the North Carolina Debt Collection Act, N.C. Gen. Stat. Ann. § 75-50 et seq. To establish a claim under the NCDCA Plaintiff must first establish three things: "[f]irst, the obligation owed must be a 'debt'; second, the one owing the obligation must be a 'consumer'; and third, the one trying to collect the obligation must be a 'debt collector.'" Friscia v. Bank of Am., N.A., 775 S.E.2d 36 (N.C. Ct. App. 2015) (quoting Reid v. Ayers, 531 S.E.2d 231, 233 (N.C. Ct. App. 2000)); N.C. Gen. Stat. § 75–50(1)–(3). After fulfilling these three requirements, "a claim for unfair debt collection practices must then meet the three generalized requirements found in section 75–1.1: (1) an unfair act (2) in or affecting commerce (3) proximately causing injury." Id. (quoting Reid v. Ayers, 531 S.E.2d at 235).

### 1. Whether Plaintiff Has Presented Evidence that the Events Occurred within North Carolina

Defendant argues that the events alleged by Plaintiff all occurred outside of North Carolina, and that as a result the NCDCA does not cover such a claim. (Doc. No. 27-1 at 13) (citing among others Star Sci., Inc. v. Beales, 278 F.3d 339, 355 (4th Cir. 2002) ("a State may not regulate commerce occurring wholly outside of its

borders.") (citation omitted)).[2]  Plaintiff disagrees, responding that Defendant has cited no such case law related to the NCDCA, that Defendant's cited cases instead involve statutes that seek to compel economic actions in other states, that Defendant is headquartered in North Carolina, and that BOA's credit card agreements state: "Agreement is made in North Carolina and we extend credit to you from North Carolina." (Doc. No. 34 at 22–23) (citing a link to an example of a BOA Credit Card agreement).

"The principle against extraterritoriality as it relates to the dormant commerce clause is derived from the notion that 'a State may not regulate commerce occurring wholly outside of its borders.'" Ass'n for Accessible Medicines v. Frosh, 887 F.3d 664, 667 (4th Cir. 2018) (quoting Star Sci., Inc. v. Beales, 278 F.3d 339, 355 (4th Cir. 2002)) (additional citations omitted). "The law is unmistakably clear that the Legislature has no power to enact statutes, even though in general words, that can extend their operation and effect beyond the territory of the sovereignty from which the statute emanates . . . . The presumption is always against any intention to attempt giving to the act an extraterritorial operation and effect." McCullough v. Scott, 182 N.C. 865, 109 S.E. 789, 796 (1921). While Plaintiff correctly notes that the cases cited by

---

[2] Defendant also cites Ass'n for Accessible Medicines v. Frosh, 887 F.3d 664, 672 (4th Cir. 2018) (explaining that a Maryland statute violated the Commerce Clause because it "seeks to compel manufacturers and wholesalers to act in accordance with Maryland law outside of Maryland."); Rocky Mountain Farmers Union v. Corey, 730 F.3d 1070, 1103 (9th Cir. 2013) (explaining that "[s]tates may not mandate compliance with their preferred policies in wholly out-of-state transactions" (citing Pharm. Rsch. & Mfrs. of Am. v. Walsh, 538 U.S. 644, 669 (2003))); Midwest Title Loans, Inc. v. Mills, 593 F.3d 660, 668 (7th Cir. 2010) ("[I]mposing a state's law on transactions in another state has a greater extraterritorial effect (and greater effect on commerce) than the state's applying its own law to suits in its courts").

12

Defendant typically involve legislation that potentially hinders the economic actions of out-of-state entities, the point nonetheless remains that a state may not regulate economic commercial activity that occurs exclusively within another state. Collecting upon a debt that occurred in commerce qualifies as economic commercial activity and is therefore an activity that a state cannot regulate if occurring entirely outside of the state in question.

It is Plaintiff's burden to show that the actions occurred within North Carolina, and Plaintiff has put forward no concrete evidence to do so. Plaintiff is a resident of Kentucky and has not claimed to reside or conduct the underlying actions within North Carolina. While it is true that BOA is headquartered in North Carolina, Plaintiff has presented no evidence that the specific decision to call Plaintiff originated in a North Carolina office, and Defendant has provided evidence (without an evidentiary counter by Plaintiff) that the calls originated from a location other than North Carolina. (Doc. No. 27-3 at 2). Plaintiff offers a generic contract from Defendant that is based in North Carolina, but it is not the contract in question here, and more importantly it fails to provide evidence that the calls to Defendant originated from, were ordered from, or were received in North Carolina. Plaintiff's NCDCA claim fails because Plaintiff has not presented evidence upon which a reasonable jury could conclude that the actions in question occurred within North Carolina.

2. <u>Whether Plaintiff Has Sufficiently Demonstrated Injury</u>

Defendant argues that Plaintiff's NCDCA claim also fails for the independent reason that Plaintiff has not demonstrated an injury beyond his own conclusory

13

testimony. (Doc. No. 27-1 at 15). Defendant argues that Plaintiff has not demonstrated economic injuries because he failed to provide evidence thereof and also could not establish that the 400 calls from a different bank did not cause the damage instead. (citing Doc. No. 27-4 at 33–41, Complaint for Barnett v. First National Bank of Omaha, Western District of Kentucky, Case No. 3:20-cv-337). Defendant then argues that Plaintiff has failed to provide sufficient evidence of emotional injuries because he only gave conclusory testimony that the calls stressed him out, rather than specific testimony or evidence. (citing Doc. No. 27-4 at 12–14, 27). Plaintiff does not contradict Defendant's argument about economic damages beyond offering that these questions should be left to a jury. Furthermore, Plaintiff argues that his repeated statements regarding the stress he incurred and the increase in medication he received demonstrate emotional damages that came as a result of the phone calls.

Plaintiff effectively concedes the economic argument by not addressing it, implicitly leaving emotional distress damages as the potential damages under this claim. To that end Ross v. F.D.I.C., 625 F.3d 808, 818 (4th Cir. 2010) is instructive. There, given the lack of medical testimony regarding Plaintiff's alleged emotional distress, the Fourth Circuit deemed Plaintiff's "own conclusory statements concerning emotional distress" insufficient as a matter of law to support such a claim alone. Id. at 818. The Fourth Circuit explained that emotional distress claims are "fraught with vagueness and speculation" such that conclusory statements of such an injury suffered by Plaintiff fail to send the question to a jury. Id. Here the same problem arises: Plaintiff has not produced medical evidence, and

instead has offered only conclusory deposition testimony to support emotional distress damages. (Doc. No. 34-3 at 19, 27, 37, 46–49). ("It stressed me out." "I just want them to quit aggravating me and stress me out." ". . . they just keep on stressing you out . . ." "No it made [my medication] more." "it just stressed me out." "A lot of stress, yes." "'Headaches, upset stomach' . . . 'Oh, yeah, had some of that, yes.'"). Because Plaintiff does not sufficiently support (and effectively concedes on) economic damages, and has provided only conclusory deposition testimony to support his remaining proposed damages, Plaintiff's NCDCA claim fails on the independent basis of damages.

D.     Plaintiff's Intrusion Upon Seclusion Claim

Finally, Defendant seeks summary judgment on Plaintiff's claim for Intrusion Upon Seclusion.

Defendant argues correctly that Kentucky law applies to Plaintiff's claim, because the injuries (if any) occurred in Kentucky. (Doc. No. 27-1 at 18). Under Kentucky law, Defendant argues, the claim fails because the standard requires that Plaintiff show "(1) an intentional intrusion by the defendant, (2) into a matter the plaintiff has a right to keep private, (3) which is highly offensive to a reasonable person." Smith v. Bob Smith Chevrolet, Inc., 275 F. Supp. 2d 808, 821–22 (W.D. Ky. 2003). Plaintiff fails this standard because Plaintiff never revoked his consent for the phone calls, and because Plaintiff has not explicitly identified the private matters intruded upon.[3] As to this last point, Defendant argues that by opening an

account and providing his cell phone number, Plaintiff opened himself up to be contacted for legitimate business purposes and cannot reasonably claim that BOA intruded on his privacy under such circumstances as those at bar. (Doc. No. 27-1 at 2).

Plaintiff argues that he revoked consent to be called but that Defendant persistently called nonetheless. (citing Tillet, 715 S.E.2d at 540 ("Examples of recognized intrusions upon seclusion include . . . persistent telephoning") (emphasis added); Pearce v. Whitenack, 440 S.W.3d 392, 401 (Ky. Ct. App. 2014) (describing the tort of intrusion upon seclusion as "the right to be let alone.")). Plaintiff's core argument is that given the 'reasonableness' standard here, such determinations are best left to a jury.

"A federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it sits." Perini/Tompkins Joint Venture v. Ace Am. Ins. Co., 738 F.3d 95, 100 (4th Cir. 2013). This Court sits in North Carolina and therefore must apply North Carolina choice of law doctrine, which in turn requires that rules of *lex loci delecti commissi*, 'the law of the place where the offense was

---

[3] Citing Sexton v. Bank of New York Mellon, No. CV 5: 15-329-DCR, 2016 WL 2354231, at *9 (E.D. Ky. May 4, 2016) (dismissing intrusion on seclusion claim based on debt collection efforts where plaintiffs did not identify the private "matters" allegedly intruded on); Howard v. Asset Acceptance, LLC, No. CIV.A. 5:12-316-DCR, 2013 WL 1760299, at *4 (E.D. Ky. Apr. 24, 2013) (dismissing intrusion on seclusion claim where plaintiff alleged "he had a reasonable expectation of privacy of solitude, seclusion, and or private concerns or affairs" as insufficient as a matter of law); Rushing v. Chase Auto Fin. Corp., No. 5:11-cv-419-JMH, 2012 WL 1752393, *4 (E.D. Ky. May 15, 2012) (dismissing intrusion on seclusion claim where plaintiff failed to "describe the reasonable privacy interest upon which Defendant allegedly intrude[d]").

committed,' determine which state's law applies in tort actions. Boudreau v. Baughman, 322 N.C. 331, 335 (1988). "Under this principle, the law of the case is [drawn] . . . from the state where the last event necessary to make an actor liable for an alleged tort takes place." Millers Mut. Ins. Ass'n of Ill. v. S. Ry. Corp., 483 F.2d 1044, 1046–47 (4th Cir. 1973) (citing Restatement of the Conflict of Laws § 377 (1934)). "Injury being the last element of a tort, North Carolina rule, in a nutshell, is the law of the place of injury." Santana, Inc. v. Levi Strauss & Co., 674 F.2d 269, 272 (4th Cir. 1982). Defendant argues persuasively, and Plaintiff does not contest, that such a state here is Kentucky: it is the state in which Plaintiff resided when the underlying events occurred, and is the state in which Plaintiff would have received the calls in question and allegedly suffered their ill effects. Kentucky, then, is the state of injury, and therefore the law of Kentucky applies to this tort claim.

The question is whether Plaintiff's intrusion upon seclusion claim survives under Kentucky law. To prevail, "Plaintiff must show (1) an intentional intrusion by the defendant, (2) into a matter the plaintiff has a right to keep private, (3) which is highly offensive to a reasonable person." Smith v. Bob Smith Chevrolet, Inc., 275 F. Supp. 2d 808, 822 (W.D. Ky. 2003). "A defendant's actions may be intentional when the Defendant acts with such reckless disregard for the privacy of the plaintiff that the actions rise to the level of being an intentional tort." McKenzie v. Allconnect, Inc., 369 F. Supp. 3d 810, 819 (E.D. Ky. 2019). As to whether Plaintiff has a private matter intruded upon, "[w]hat constitutes a private matter is dependent upon whether the plaintiff has a reasonable expectation of

17

privacy in the subject information." <u>Webb v. Bob Smith Chevrolet, Inc.</u>, 2005 WL 2065237, at *6 (W.D.Ky. Aug.24, 2005).

Plaintiff's claim fails because Plaintiff did not have a reasonable expectation of privacy in the matter in question, and as such the intruded-upon matter was not one that Plaintiff had a right to keep private. Plaintiff voluntarily entered into a contractual agreement through which monies were extended to him. He then failed to make the agreed upon payments on a timely basis. The creditor then pursued a distasteful but lawful strategy of debt collection – that of making hundreds of calls over a relatively short period of time to Plaintiff. However, Plaintiff had already consented, and not withdrawn consent, to such calls. As discussed above, Plaintiff simply requested to be contacted by mail and stated that he would contact Defendant when he was able to pay, but never directly asked Defendant to stop contacting him. In fact, Defendant informed Plaintiff that the calls would continue, and Plaintiff did not argue, even saying "Okay." Although he said that he wished for Defendant to send communications by mail, he never told them to stop calling. Plaintiff had thereby legally consented to the calls until he informed Defendant otherwise, and as such the intrusion in question was not into a matter that Plaintiff had a right to keep private.

Questions of reasonability are typically questions for a jury; however, when Plaintiff has presented no evidence under which a reasonable jury could hold otherwise, summary judgment is appropriate. Here, because Plaintiff voluntarily obtained money, did not timely make payments, and then legally consented to the calls in question. He has not described a privacy right violated by the Defendant.

18

Plaintiff's final claim fails as a matter of law.

## III. CONCLUSION

**IT IS THEREFORE ORDERED** that:

1. Defendant's motion for summary judgment, (Doc. No. 27), is **GRANTED**;

2. Plaintiff's Complaint, (Doc. No. 1), is **DISMISSED with prejudice**; and

3. The clerk of court is directed to close this case.

Signed: May 28, 2021

Robert J. Conrad, Jr.
United States District Judge